## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jessica Brown,

                Plaintiff,

         v.

Diversified Distribution Systems, LLC,

                Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 13-218 ADM/LIB

───────────────────────────────────────

Thomas E. Glennon, Esq., Thomas E. Glennon, P.A., Minneapolis, MN, on behalf of Plaintiff.

Jessica L. Roe, Esq., and Pamela D. Steinle, Esq., Bassford Remele, PA, Minneapolis, MN, on behalf of Defendant.

───────────────────────────────────────

## I. INTRODUCTION

On March 12, 2014, the undersigned United States District Judge heard oral argument on Defendant Diversified Distribution Systems, LLC's ("DDS") Motion for Summary Judgment [Docket No. 22]. Plaintiff Jessica Brown ("Brown") opposes the motion. For the reasons stated herein, DDS's motion is granted.

## II. BACKGROUND

In 2002, Brown began working for DDS, a company providing supply chain services to commercial customers. Jessica L. Roe Decl. [Docket No. 25] Ex. A1. In January 2006, DDS promoted Brown to "associate" account executive, a position sometimes referred to by DDS employees as the "back-up" account executive. See id. Exs. A2, A4. Account executives at DDS handle specific customer accounts; these executives are sometimes referred to as "customer-facing." See, e.g., Thomas Glennon Aff. [Docket No. 30] Ex. 3 ("Kostecky Dep.") 170. Employees in the "back-up" role assume the responsibilities of account executives when

the executive assigned to the account is absent due to vacation, illness, or other reasons.  See

Roe Decl. Ex. A2, Ex. B ("Brown Dep.") 35-36.[1]  They also conduct various support activities,

such as training and developing systems.  "Back-up" account executives at DDS have the

difficult task of understanding and being familiar with many DDS customers without interacting

with these customers on a daily basis.  By all accounts, Brown received positive performance

reviews in her position as a "back-up" or "associate" account executive.  Id. Ex. A4.

In January 2009, DDS promoted Brown to account executive.  Id. Ex. A5.  As an account

executive, Brown received an 8% raise on January 1, 2009.  If she met all expectations, Brown

was told she would qualify for additional raises on July 1, 2009, and July 1, 2010.  Id.

Brown's 2009 performance review listed many strengths and one significant area needing

improvement.  Sharon Champion, her supervisor at the time, assessed that Brown had strong

customer service skills and had developed a deep knowledge of the company through her years

working as a "back-up" associate.  Id. Ex. A7, at 1.  However, Champion also found that Brown

did not complete required reporting on customer invoices—reports referred to as the "No Move"

and "Slow Move" reports.  Id. at 2.  Champion wrote, "I am concerned that there are no figures

reported in the No Move Slow Move report . . . It is critical that these reports be billed every

month . . . without exception."  Id.  Brown's failure to properly report on customer accounts had

begun causing problems for others.  Id.  The review concluded with a warning: "Jessie [Brown]

needs to be aware that going forward, failure to work and bill the No Move and Slow Move

Report will result in Progressive Disciplinary Action up to and including termination.  It is

---

[1]  Portions of Brown's deposition were also submitted by Brown.  See Thomas Glennon
Aff. [Docket No. 30] Ex. 2.

important that it is understood how serious this is." Id.  Brown signed the review to

acknowledge its contents.  Id.

In February 2010, Brown took twelve weeks of FMLA leave after she was diagnosed

with cancer.  Brown Dep. 29-30.  Brown continued to receive lighter doses of chemotherapy

after she returned to work.  Brown worked from home and took occasional time off as needed.

Id. at 30-31.

After Brown returned to work, she continued to struggle with adequately completing the

"No Move" and "Slow Move" reports.  In her 2010 performance review, DDS noted that despite

training, Brown had not properly learned how to complete these reports, forcing other employees

to step in and complete them on Brown's behalf.  In one instance, Brown assured her manager

she would complete months' worth of incomplete reports but failed to do so.  This put "more

revenue than the company could afford to lose" at risk, caused "embarrassment" to DDS, and put

"the customer in a difficult position." Id. Ex. A9.

As part of her promotion to account executive, Brown was to receive a pay raise on July

1, 2010.  This raise was delayed six months, until January 3, 2011, due to Brown's failure to

meet expectations.  Id.  Although Brown still did not fully meet expectations by January 2011,

she nevertheless received the raise.  Id. Exs. A9, A10.

On July 6, 2011, Champion conducted a mid-year review of Brown's performance.  The

review was largely positive, again noting Brown's strengths in customer service and knowledge

of DDS's systems.  Id. Ex. A11.  Identified as an area for improvement, Champion directed

Brown to include her manager on "Action Item Lists," and continue to reduce the number of

personal emails and non-work activity conducted during the day.  Id.  The review made no

3

mention of the "No-Move" and "Slow Move" reports.  See id.

DDS came under new ownership at the end of 2011.  In early 2012, Jim Murphy, the new owner, told managers to rank their employees by performance, and to terminate the lowest-performing employees.  Mary Louise Pirkl Aff. [Docket No. 26] ¶ 4.  Susan Kostecky, a manager on the same level as Sharon Champion, assumed supervision of Brown at this time.  Roe Decl. Ex. C ("Kostecky Dep.") 49.  Kostecky had some prior familiarity with Brown's job performance, and she also reviewed Brown's employment file.  Id. at 50-52.  Based on the review, Kostecky identified Brown as a low-performing employee.  Pirkl Aff. ¶ 4.  At the same time, DDS began restructuring the account "back-up" position.  The new position involved greater training responsibilities and management of customer accounts, and it had equal pay and benefits with the traditional account executive position.  Id. ¶ 5; Kostecky Dep. 198.

On January 9, 2012, Champion, Kostecky, and Director of Human Resources Mary Louise Pirkl met to discuss account executive candidates.  During the meeting, the three managers considered moving Brown into the newly-restructured "back-up" position.  Pirkl Aff. ¶ 6.  The three concluded that Brown's customer skills, knowledge of DDS's systems, and ability to train others made her well-suited for the role.  Id. ¶ 6; Kostecky Dep. 57-58.

In late January 2012, Brown informed DDS that she was pregnant, and that the pregnancy was high-risk.  Pirkl Aff. ¶ 7.  Pirkl "pushed" Kostecky not to move Brown to the new "back-up" position until Brown returned from her leave.  Pirkl "was worried that the stress might affect [Brown's] pregnancy," and "didn't want DDS to be responsible for any problems that might arise."  Id.  Kostecky agreed to wait to inform Brown of the position change until she returned from leave.  Id.; Kostecky Dep. 94.  In her deposition, Kostecky testified that she had

4

wanted to move Brown prior to her FMLA departure, but "because it was a highly sensitive pregnancy," she agreed not to "do anything that might upset her." Id. at 94, 115-16. In February 2012, Kostecky confirmed to Champion that she had decided to move Brown to the new back-up position, but not to inform Brown of the decision until after Brown returned from leave. Roe Decl. Ex. A13 (emails between Kostecky and Champion).

Over the next few months, DDS accommodated Brown's doctor appointments and medical needs by allowing her to take time off and also work from home. Brown Dep. 56-57, 66, 131. Brown provided "informal" account executive training to Rachel Jordahl, and Jordahl began covering for Brown during her medical appointments. Id. at 66-67. At the time, Brown believed Jordahl would be assuming a back-up position, and would only perform Brown's duties during her maternity leave. Id. at 66, 71, 75. The actual plan was for Jordahl to formally assume Brown's account executive duties, with Brown shifting to the "coverage" and training position upon her return. Roe Decl. Ex. A13.

On April 20, 2012, Champion sent a spreadsheet to DDS's new owner, Murphy, that included brief reviews of DDS employees. Id. Ex. A14 (filed under seal).[2] The document described Brown and five other account executives as "Underperforming." In the "Action" column addressing Brown's performance, the document stated: "Jessie [Brown] is in the process of training her replacement. Upon returning from maternity leave, Jessie will transition into a back up role. Jessie was successful in this role prior to taking on her current position." Id. at 800.

---

[2] Where possible, the Court attempts to abide by the parties' confidentiality designations by referring only to information that has been publicly discussed by the parties in their memoranda.

On June 7, 2012, Urban Outfitters named DDS its "Vendor of the Year" for the second

year.  Glennon Aff. Ex. 24.  Brown was part of the team that served Urban Outfitters, and thus

shared in the congratulatory emails circulated at DDS.  Id.

On June 10, 2012, Brown's child was born, and she began taking FMLA leave.  Brown

Dep. 126.  Shortly thereafter, DDS learned that Chico's, a significant retail customer, would no

longer be a client.  Based on this loss of business and DDS's overall need to reduce costs, DDS's

officers directed managers to make 10% reductions to their respective payrolls.  See Roe Decl.

Ex. D ("Kozicky Dep.") 32, 54 (testimony of financial officer).  On July 20, 2012, Champion

forwarded an updated spreadsheet reflecting employee performance.  In Kostecky's department,

only three "underperforming" employees remained: Zac Litzow, Muriel Otto, and Brown.  Roe

Decl. Ex. A15 (filed under seal).

On August 17, 2012, Brown contacted Kostecky about returning to work early.

However, due to child care issues, Brown requested permission to work from home for several

weeks.  Brown Dep. 73.  Kostecky granted Brown's request, and scheduled Brown to begin

performing back-up and training duties.  Kostecky informed Brown that she would be

permanently moved from the traditional account executive role to the new back-up and training

role.  Id. at 73-77, 108.  Brown was unhappy with the change, which she believed was a

demotion.  See id. at 78.

On August 20, 2012, Brown began working from home, and on September 4, 2012, she

returned to work at the DDS office.  Roe Decl. Ex. A16; Not. of Removal [Docket No. 1] Ex. A

(Compl.) ¶ 4.  As she had prior to her FMLA leave, Brown worked from home on Monday of

each week.  See Brown Dep. 75.  At some point, however, Brown was informed she was needed

6

for training sessions on Monday, and could no longer work from home.  Despite this instruction, Brown worked in-office on only one Monday after her return.  See id. at 148.

On September 12, 2012, Murphy wrote an email to DDS managers in which he emphasized the necessity of conducting a 10% reduction in staffing by the end of the month. Murphy directed all managers to propose plans for the reduction quickly, so that they could be discussed and implemented by the end of the month.  Roe Decl. Ex. A17.  In response, Kostecky proposed a plan that suggested terminating Litzow and Otto, but not Brown.  Id. Exs. A15, A18 (filed under seal).

On September 25, 2012, Brown received a mid-year performance review from Kostecky. Brown's overall performance score was 2.67, based on a scale of "1+" meaning "Exceptional," and "4" meaning below expectations.  Glennon Aff. Ex. 19 (filed under seal).  The review, the first conducted by Kostecky after she assumed management over Brown, noted satisfactory results in some areas, such as productivity, but noted several areas needing improvement.  See id.

On October 4, 2012, Brown complained to Rebecca Wolszon, a human resources employee, that she was unhappy with her new position and her performance review.  Compl. ¶ 8; Brown Dep. 83-84; Glennon Aff. Ex. 5 ("Wolszon Dep.") 33-36.  Brown was also unhappy that she was being required to work on Mondays, because it made child care too costly.  Brown Dep. 92, 143.  Brown met with Wolszon a second time, this time expressing concern that DDS had discriminated against her for taking FMLA leave or interfered with her FMLA rights.  Wolszon Dep. 47-48.  Wolszon relayed Brown's complaints to Pirkl, the Director of Human Resources. Id.

7

At the same time or shortly thereafter, Kostecky began having second thoughts about her plan to terminate Litzow.  Litzow had previously performed strongly in a back-up capacity, and could handle "tough" accounts well.  Also, according to a national account manager at DDS, Litzow had a strong relationship with Talbot's, another significant retail customer.  If DDS laid off Litzow, it risked losing Talbot's future business.  Kostecky Dep. 167-70.  As a result, Kostecky decided to terminate Brown, concluding Litzow could better handle the customers with DDS at the time, and hoping to avoid the loss of Talbot's business.  Id. at 170-72, 193-96.

On October 9, 2012, Kostecky and Pirkl met with Brown to terminate her employment.[3] Brown Dep. 106; Kostecky Dep. 170-72.  DDS provided Brown with a letter stating she was being terminated due to the loss of the Chico's account, a decrease in business which forced DDS to restructure.  Brown Dep. 149-50.  DDS also provided Brown with a copy of her personnel file, which Brown considered incomplete.  Id. at 151.

On October 15, 2012, Brown requested DDS provide her with the reason for her termination, as well as a copy of her personnel file.  Compl. ¶¶ 12-19.

On or about December 21, 2012, Brown initiated this action by serving a complaint on DDS, venued in Hennepin County District Court.  See Compl.  On January 28, 2013, DDS removed this action to federal court under 28 U.S.C. §§ 1331 and 1367.  Brown alleges three claims: (1) interference and discrimination with her FMLA rights; (2) failure to provide a written notice of the reason for Brown's termination in accordance with Minn. Stat. § 181.933, subd. 1; and (3) failure to provide Brown with a complete copy of her personnel file in accordance with Minn. Stat. § 181.961.

---

[3] Otto was also terminated the same day.  Kostecky Dep. 170-72.

8

# III.  DISCUSSION

## A.  Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

The United States Supreme Court, in construing Federal Rule 56(c), stated in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.  <u>Ludwig v. Anderson</u>, 54 F.3d 465, 470 (8th Cir. 1995).  However, the nonmoving party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  <u>Krenik v. Cnty. of Le Sueur</u>, 47 F.3d 953, 957 (8th Cir. 1995).  A plaintiff facing a summary judgment motion cannot "get to a jury without any significant probative evidence tending to support the complaint."  <u>Rath v. Selection Research, Inc.</u>, 978 F.2d 1087, 1091 (8th Cir. 1992) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)).

## B.  FMLA

The FMLA grants eligible employees the right to take a total of 12 work-weeks of maternity leave during any 12 month period.  29 U.S.C. § 2612(a)(1)(A).  When an employee returns from leave, the employee has the right: "(A) to be restored by the employer to the

position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." Id. § 2614(a).

The Eighth Circuit Court of Appeals has held that the FMLA allows an employee to bring three types of claims: (1) entitlement; (2) retaliation; and (3) discrimination. Brown v. City of Jacksonville, 711 F.3d 883, 890-91 (8th Cir. 2013). Regarding entitlement claims, § 2615(a)(1) makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. An entitlement claim arises when, for example, an employer refuses to allow an employee to exercise FMLA rights or discourages the employee from doing so. Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1005 (8th Cir. 2012). Retaliation claims arise under § 2615(a)(2), which does not allow an employer to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. For example, if an employer takes an adverse employment action against an employee for complaining about a violation of the FMLA, the employer has given rise to a retaliation claim. Pulczinski, 691 F.3d at 1005-06 (holding that FMLA retaliation claim "is analogous to retaliation claims that are familiar under Title VII and other federal antidiscrimination statutes"). Finally, discrimination occurs when an employer takes an adverse action against an employee for exercising rights under the FMLA. Id. at 1006.

Although the differences between the types of FMLA claims are not "hard and fast," Eighth Circuit courts have continued to address them separately. See Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 (8th Cir. 2006) (quoting Dillaway v. Ferrante, No. 02-715, 2003 WL 23109696, at *5 (D. Minn. Dec. 9, 2003)).

In this case, the parties confuse the terminology used in the text of the FMLA with the three claim types identified by the Eighth Circuit. Brown alleges DDS "interfered" with her FMLA rights by demoting her, and then "retaliated" against her by terminating her employment after she complained about the demotion. See Pl.'s Opp'n Mot. Summ. J. [Docket No. 28] ("Pl.'s Opp'n") 26-31. Viewed under the claims framework set forth by the Eighth Circuit, and as discussed below, Brown's allegations are more properly characterized as "retaliation" and "discrimination" claims.

### 1. Entitlement

An entitlement claim requires a plaintiff to show her employer has denied or discouraged the exercise of FMLA entitlements. Stallings, 447 F.3d at 1050. While an entitlement claim does not create strict liability, an employee may prove interference with an FMLA entitlement "regardless of the employer's intent." Id.

Brown has not alleged or demonstrated an entitlement claim. As Brown states in the Complaint, she "applied for and was approved to commence a leave of absence" under the FMLA. Compl. ¶ 6. Prior to her taking leave, DDS facilitated Brown's need to leave the office to attend doctor's appointments in connection with her pregnancy. Brown Dep. 56-57, 66-67, 131. Brown then took leave under the FMLA for the birth of her child without incident. When Brown faced financial difficulty and asked to return to employment but perform her work from home, DDS accommodated this request for several weeks. Brown Dep. 73-77, 108. The evidence does not suggest, nor does Brown argue, that DDS attempted to discourage Brown from taking FMLA leave, or that DDS denied or otherwise restricted her entitlements under the Act.

11

**2.  Discrimination**

Brown's allegations that DDS demoted her due to her taking FMLA leave are most properly viewed as a claim of FMLA discrimination.  See Puczinski, 691 F.3d at 1006.  A discrimination claim arises when an employer takes an adverse employment action against the employee with regard to "the terms and conditions of employment," and the adverse action "was motivated by the employee's exercise of rights under the FMLA."  Id.

Where direct evidence of discrimination is lacking, Eighth Circuit courts have used the McDonnell Douglas burden-shifting framework to evaluate FMLA discrimination claims.  Id. at 1007; Wierman v. Casey's Gen. Stores, 638 F.3d 894, 999 (8th Cir. 2011); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under the framework, the plaintiff must first establish a prima facie case of discrimination by showing: (1) "she engaged in protected conduct;" (2) "she suffered a materially adverse employment action;" and (3) "the materially adverse action was causally linked to the protected conduct."  Wierman, 638 F.3d at 999.

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to "come forward with evidence of a legitimate, nondiscriminatory reason for the adverse action."  Phillips v. Mathews, 547 F.3d 905, 912 (8th Cir. 2008).  The defendant's burden "is not onerous and the showing need not be made by a preponderance of the evidence."  Wallace v. Sparks Health Sys., 415 F.3d 853, 860 (8th Cir. 2005).

If the defendant establishes a nondiscriminatory reason, the burden returns to the plaintiff to identify evidence "that creates an issue of fact as to whether the asserted reason was pretext for discrimination."  Phillips, 547 F.3d at 912.  Establishing pretext requires more substantial

evidence than necessary to establish a prima facie case, "because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification."  Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002).

Brown has established the first two elements of a prima facie case of discrimination. DDS does not dispute that Brown's taking of leave in connection with pregnancy qualified as a protected exercise of rights under the FMLA.  And for the purposes of this motion, DDS does not dispute that Brown's move to "back-up" account executive meant Brown was not restored to her original position or an equivalent position, as required by the FMLA.  Def.'s Mem. Supp. Summ. J. [Docket No. 24] 11; See 29 U.S.C. § 2614(a)(1)(B); 29 C.F.R. § 825.215.

However, Brown has not demonstrated the third element of a prima facie case: a causal link between her leave of absence and her change in position.  DDS submits evidence, which Brown does not contest, demonstrating DDS management decided to move Brown to the new "back-up" position before Brown informed DDS of her pregnancy.  Shortly after it came under new ownership, DDS began redefining some its employment positions.  Kostecky concluded that her team needed employees with stronger support and training skills, and identified Brown as having the knowledge necessary to fill such a role.  Kostecky Dep. 57-58.  Thus, on January 9, 2012, Kostecky met with Pirkl and Champion, and discussed moving Brown to the new, strengthened "back-up" position with equivalent pay to her position as an account executive.  Pirkl Aff. ¶ 5.  Based on these facts, DDS could not have discriminated against Brown for taking FMLA leave, because Brown did not announce her pregnancy until the end of January, and she did not take leave until nearly six months later.  Brown Dep. 53, 125-26; see, e.g., Smith, 302 F.3d at 834 (finding lack of pretext in part because employee problem raised before leave); Leal

v. BFT, Ltd. P'ship, 423 F. App'x 476, 481 (5th Cir. 2011) (finding lack of causation where employment decision was discussed before leave).

Brown attempts to generate a question of fact by arguing that no evidence of record indicates DDS planned to move Brown until after Brown announced her pregnancy.  Contrary to this argument, however, both Kostecky and Pirkl testified that they met to discuss Brown's change in position shortly after the company changed ownership.[4]  Instead of disputing this evidence, Brown relies on the testimony of persons who played no role in deciding her reassignment.  For instance, Brown cites the testimony of DDS national account manager John Dodd, who testified that he assumed the plan was for Brown to resume her position upon her return.  Glennon Aff. Ex. 4 ("Dodd Dep.") 66, 149.  But as Dodd admitted, he "honestly had no idea what the plan was," and was not responsible for deciding Brown's role.  Id. at 65, 112-13.  Similarly, Jordahl, Brown's eventual replacement as account executive, played no role and was not privy to decisionmaking regarding Brown's employment.  Glennon Aff. Ex. 6 ("Jordahl Dep.") 26-27, 62; see also Wolszon Dep. 33 (Wolszon testifying she played no role in Brown's reassignment).  Brown's testimony does not place the January 9, 2012 meeting into dispute, and fails to establish causation.

Even assuming Brown had established a prima facie case of discrimination, DDS has stated a legitimate reason for Brown's move to the "back-up" position.  While Brown had a

---

[4]  In her opposition to summary judgment, Brown argues that Pirkl's affidavit was a document produced after the discovery deadline in this action.  But affidavits are routinely written in connection with summary judgment motions.  As DDS notes, Brown had the opportunity to depose Pirkl but did not do so.  Similarly, Brown's counsel deposed Kostecky but cites no instance in which Kostecky was asked about a pre-FMLA leave meeting.  Nevertheless, Kostecky did testify that "right after Jim [Murphy] bought the company," Kostecky began considering Brown for the new "back-up" role.  Kostecky Dep. 57-58.

strong track record of performing in the "back-up" role, she continued to struggle in the account executive position. When Kostecky assumed supervision over Brown in January 2012, she identified Brown as better suited for the "back-up" position. Kostecky Dep. 49-52, 54, 57-60. At the same time, Kostecky identified a need for a stronger "back-up" role in her group. Id. As a result, Kostecky decided to move Brown from a position she was underperforming in to a position in which Brown had previously done well.

Having stated a legitimate reason for the change in position, the burden shifts to Brown to demonstrate that the stated reason was pretext for discrimination. An employee may prove pretext by:

> [D]emonstrating that the employer's proffered reason has no basis in fact, that the employee received a favorable review shortly before he was terminated, that similarly situated employees who did not engage in the protected activity were treated more leniently, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies.

Stallings, 447 F.3d at 1052. In reviewing the motivation for employment decisions, courts may not act as "super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers." Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995).

Brown has not proved pretext for discrimination. Although Brown had areas of strength as an employee, her overall performance history does not show DDS ignored or changed its assessment of Brown due to her taking FMLA leave. Cf. Hillins v. Mktg. Architects, Inc., 808 F. Supp. 2d 1145, 1152 (D. Minn. 2011) (finding evidence of pretext in part because employer had considered plaintiff for vice president position until she announced her pregnancy, after which employer terminated her during her leave). From the time Brown first assumed the customer-

facing account executive position in 2009, she received direct warnings regarding her handling of certain reports, among other issues.  See, e.g., Roe Decl. Ex. A7.  In early January 2012, Kostecky identified Brown as one of the lowest-performing account executives in her department.  Pirkl Aff. ¶ 4.  In an April 2012 company-wide review, Brown again ranked among several employees identified as low-performing.  Roe Decl. Ex. A14.  By July 2012, only three employees identified as low-performing remained in the account executives group: Otto, Litzow, and Brown.  Id. Ex. A15.  While Brown had been part of the team that won service awards from Urban Outfitters, there is no evidence that DDS ignored this shared effort, nor is there any evidence that this success outweighed the problems Kostecky had identified.

Brown correctly asserts that Kostecky replaced her as account executive with Jordahl, a new employee.  This replacement does not evince discrimination because Kostecky consistently viewed Brown as better in the "back-up" position with training duties than in the account executive position.  Thus, while Brown received an "underperforming" grade in the traditional account executive role, Jordahl received a "good" grade.  Roe Decl. Ex. A14.  Brown offers no evidence that Jordahl was similarly-situated to Brown in terms of performance, and that Brown's decision to take FMLA leave was a motivating factor causing DDS to choose Brown for the "back-up" role instead of Jordahl.  See Wierman, 638 F.3d at 994 ("To be similarly situated, the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.") (quotation omitted).  A company's decision to replace an experienced employee with a new, potentially better-suited employee is a business decision the Court will not second-guess.  Hutson, 63 F.3d at 781.

16

Finally, the record indicates DDS provided Brown with voluntary accommodations in addition to those required by the FMLA.  DDS routinely allowed Brown to work from home or leave the office to attend medical appointments.  And, as noted above, when Brown requested permission to return to employment early from her FMLA leave but continue working at home, DDS allowed her to do so.  Brown Dep. 73-77, 108.  Although DDS told Brown upon her return that she could no longer work from home on Mondays, Brown admitted that she only worked in the office once on a Monday.  Id. at 148.  To rebut this evidence, Brown does not cite evidence of an instance or circumstance that might suggest a discriminatory motive, nor does she cite any evidence that other employees received more favorable treatment or accommodations than she did.  See Bevan v. Honeywell, Inc., 118 F.3d 603, 610 (8th Cir. 1997) (stray remarks or other conduct could help show pretext where the evidence might "cause a reasonable trier of fact to raise an eyebrow") (citation omitted).  As a result, Brown has failed to show a genuine issue of fact with regard to her FMLA discrimination claim.

### 3.  Retaliation

Brown's claim that DDS terminated her due to her complaints about FMLA discrimination after she returned from leave are best characterized as retaliation claims, which are also viewed under the McDonnell Douglas framework.  See, e.g., Stallings, 447 F.3d at 1051-52.

Based on the timing of Brown's termination, she has established a prima facie case of retaliation.  As before, the first two elements of Brown's prima facie case are essentially undisputed.  First, Brown engaged in protected activity by complaining to Wolszon, an employee in Human Resources, about a perceived instance of FMLA discrimination.  See Pirkl Aff. ¶¶ 9,

11; Brown Dep. 83-86, 150; Wolszon Dep. 36-41.[5]  Second, Brown suffered a material adverse employment action when DDS terminated her.  With respect to the third element of her prima facie case, the record demonstrates a temporal proximity between Brown's complaints and her subsequent termination.  Brown first met with Wolszon in early October 2012, and was fired less than a week later.  Wolszon Dep. 47-48.  Even absent other evidence of retaliation, this temporal proximity demonstrates prima facie causation.  See Smith, 302 F.3d at 832-33.  But when temporal proximity is the only evidence of causation, as is the case here, the resulting prima facie case is weak.  See id. at 832-34.

In response, DDS has stated legitimate reasons for Brown's termination.  During the summer of 2012, DDS lost Chico's business and began implementing layoffs.  Roe Decl. Ex. A17.  As discussed, Kostecky had initially planned to retain Brown in the new "back-up" role, and terminate Otto and Litzow.  Id. at A18.  However, as the deadline approached, Kostecky learned Litzow had a strong relationship with Talbot's, and that firing Litzow might result in losing Talbot's business.  Given this risk, Brown's overall performance, and Litzow's ability to handle "tough" accounts, Kostecky decided to terminate Brown instead of Litzow.  Kostecky Dep. 167-70.

Having stated legitimate reasons for termination, Brown must show the stated reasons were pretext for retaliation.  Brown does not dispute that DDS issued a company-wide directive to reduce staffing by 10%, nor does she dispute that as a manager, Kostecky validly planned to follow this directive by laying off two employees.  See Pl.'s Opp'n at 30.  However, Brown

---

[5]  According to Pirkl's affidavit, Pirkl did not recall being told about Brown's FMLA complaint.  Pirkl Aff. ¶ 11.  Viewed in the light most favorable to Brown, however, the Court assumes Pirkl was aware of the complaint from Wolzon's involvement.

argues DDS changed its plan from terminating Litzow to terminating her due to a retaliatory

motive.  In support of her argument, Brown cites evidence of being told she was part of the "go-

forward" team, meaning she was told she would not be laid off in October 2012.  See Kostecky

Dep. 167.  Brown also argues she received better reviews that Litzow, had performed well with

key DDS clients such as Urban Outfitters, and had better qualifications than Jordahl, the account

executive who replaced her.  Finally, Brown argues DDS confirmed its retaliatory motive when

it failed to re-hire her after regaining key customers.

Brown has not demonstrated a genuine issue of fact as to whether DDS's stated reason

for termination was pretext for retaliation.  Although Kostecky told Brown she was part of the

"go-forward" team, Kostecky did so before she learned about Litzow's ties to Talbot's.

Kostecky Dep. 168-70.  Although Litzow was ranked as performing at or below Brown's level,

Brown does not cite any evidence that her termination would have resulted in a similar loss of

business.  See Kostecky Dep. 157.  Thus, while Litzow and Brown may have been similarly

underperforming, they were not similarly-situated.  Although Brown shared in the customer

service awards from Urban Outfitters, she did so as part of team, and there is no evidence

Brown's termination could have risked the loss of this customer.  In addition, as discussed

above, while Brown received similar or better reviews than Litzow, these reviews were still not

favorable.

Brown has also failed to demonstrate how DDS's handling of her termination proves a

retaliatory motive.  For instance, several employees believed Brown would be part of the "go-

forward" team, but Brown does not explain how mistaken assumptions or false assurances

evinced an intent to retaliate against Brown for voicing complaints.  And the only evidence of

record regarding Kostecky's late decision to terminate Brown instead of Litzow establishes that

Kostecky changed her mind for business reasons, reasons that the Court may not second-guess.

Hutson, 63 F.3d at 781.  Once DDS decided to terminate Brown, it did not change its explanation

for the decision or violate company policies to effectuate the termination.  See Stallings, 447

F.3d at 1052.

Finally, DDS's failure to re-hire Brown is not evidence of retaliation.  This is not an

instance in which an employee resigned or was voluntarily terminated specifically due to her

disability or need for FMLA leave.  See, e.g., Jackson v. City of Hot Springs, No. 13-1772, 2014

WL 1876129 (8th Cir. May 12, 2014).  Absent such a circumstance, DDS's decision to hire or

re-hire a legitimately-terminated employee is strictly a business decision.  Even so, Brown

submits no evidence that she actually re-applied for a position.  See, e.g., Deen v. Clairday Food

Serv. Enters., Inc., No. 4:10CV1160JMM, 2011 WL 3502329 (E.D. Ark. Aug. 10, 2011).

Viewed in the light most favorable to Brown, she has not demonstrated a genuine issue of fact as

to whether DDS's decision to terminate her was retaliation for her complaints about perceived

FMLA discrimination.

## C.  Failure to Provide Personnel File and Reason for Termination

In addition to her FMLA claim, Brown alleges two counts for violations of Minnesota

employment law.

### 1.  Minn. Stat. § 181.933

Minnesota Statute § 181.933 states an employee "who has been involuntarily terminated

may, within 15 working days following such termination, request in writing that the employer

inform the employee of the reason for the termination."  If the employer does not respond in

writing with the "truthful reason for the termination" within 10 days, the employee may seek $25 per day in damages, for a maximum of $750, until the employer complies.  Id. §§ 181.933, 181.935.  DDS provided Brown with written notice at the time of her termination, stating a need to reduce costs and restructure the department led to the firing.  Brown contends this letter did not satisfy § 181.933 because it did not state the "truthful reason."

This claim must fail because § 181.933 applies only to terminations made in connection with Minnesota's whistleblower statute, § 181.932.  See Miller v. Bostrom, No. 11-2401, 2013 WL 460634, at *6 (D. Minn. Feb. 7, 2013) (dismissing § 181.933 claim for failure to establish whistleblower violation).  Brown does not allege or argue a whistleblower claim in this action.

### 2.  Minn. Stat. § 181.961

Under Minnesota Statute § 181.961, an employee has the right to request the inspection of her personnel file, which the employer must make available within 7 days if the file is kept in-state, and 14 days if the file is kept out of state.  Id. § 181.961, subd. 2.  For an employee no longer working for the employer, the employer must provide a copy.  Id.  If the employer fails to comply, the employee may file suit for compliance and "actual damages only."  Id. § 181.965, subd. 1.  At the time of her termination, DDS provided Brown with several personnel documents from her file.  However, Brown argues DDS failed to provide her full personnel file until discovery in this action was underway: much later than the time limits allowed by statute.

Brown's claim must fail for want of available relief.  The personnel statute states failure to comply with § 181.961 will afford the plaintiff only two forms of relief: compliance with the statute and actual damages.  Id. § 181.965.  Brown does not argue she still lacks portions of her personnel file, meaning the first form of relief is no longer applicable.  In addition, Brown does

not allege, let alone submit supporting evidence, that she suffered any actual harm as a result of

DDS's alleged delay.  Absent any redressable injury, Brown's claim cannot survive as a matter

of law.  See Brustad v. Rosas, No. CX-99-1041, 1999 WL 1256352, at *3 (Minn. Ct. App. Dec.

28, 1999) (affirming dismissal where employee failed to allege damages).

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.   Defendant Diversified Distribution Systems, LLC's Motion for Summary

Judgment [Docket No. 22] is **GRANTED**.

2.   All claims in the Complaint [Docket No. 1-1] are **DISMISSED WITH**

**PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  June 16, 2014.